NOTICE
Decision filed 11/05/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250474-U

NO. 5-25-0474

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* LAKIYAH F., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Bond County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 23-JA-28 |
| | ) | |
| Endia F., | ) | Honorable, |
| | ) | Janet R. Heflin, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Cates and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's judgment terminating respondent's parental rights was not against the manifest weight of the evidence where the State met its burdens of proving that respondent was unfit to parent and that termination was in the best interest of the minor. The court's order changing the minor's permanency goal was similarly not against the manifest weight of the evidence. Furthermore, respondent cannot show that her attorney's performance was deficient or prejudiced her in any way. As any arguments to the contrary would lack merit, we grant respondent's appointed counsel on appeal leave to withdraw and affirm the circuit court's judgment.

¶ 2    Respondent, Endia F., appeals from the May 9, 2025, order of the circuit court of Bond County terminating her parental rights over her minor daughter, Lakiyah F. Respondent's appointed attorney on appeal concluded this appeal lacks substantial merit and filed a motion to

1

withdraw as counsel pursuant to *Anders v. California*, 386 U.S. 738 (1967), along with a memorandum of law in support of that motion.

¶ 3     Appointed counsel gave proper notice to respondent. This court has allowed her to file a *pro se* brief, memorandum, or other document explaining why counsel should not be allowed to withdraw, or why this appeal has merit, but she has not done so. This court has examined counsel's *Anders* motion and the accompanying memorandum of law, as well as the entire record on appeal, and concludes this appeal lacks merit. Accordingly, respondent's appointed attorney is granted leave to withdraw as counsel, and the judgment of the circuit court is affirmed.

¶ 4                                     I. BACKGROUND

¶ 5     On August 31, 2023, the State initiated the underlying cause of action against respondent[1] by filing a petition for adjudication of wardship regarding Lakiyah F, born October 2019. The State alleged that the child was neglected by both parents by reason of an environment injurious to her welfare pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)). The State cited "ongoing concerns" about both parents' "illicit drug use and ability to care for" the minor. The State additionally noted that the father had entered into a safety plan with the Department of Children and Family Services (DCFS), pursuant to which he was to have no contact with the child during DCFS's investigation into reported neglect/abuse, but that he had violated this plan by physically removing the minor from the agreed placement and continuing to have contact with her.

¶ 6     The circuit court entered a temporary custody order the same day, finding that probable cause existed for removing the minor from her parents based on the State's allegations and the

---

[1]The petition named both respondent and the child's putative biological father. However, as the latter is not a party to this appeal, we limit our discussion to respondent.

testimony presented. The child was placed with her maternal grandmother. Also on August 31, 2023, both parents were ordered to submit to random drug testing. The State filed an amended petition for adjudication of wardship on October 11, 2023, adding an additional allegation of the child's neglect, based on respondent being charged with harboring a runaway while the minor was present.[2]

¶ 7                              A. Pre-Termination Reports and Proceedings

¶ 8    DCFS filed a visitation and contact plan on September 18, 2023. Caritas Family Solutions (Caritas) filed an adjudicatory report on October 13, 2023, setting forth the following tasks on respondent's six-month service plan: (1) cooperation with Caritas, (2) substance abuse treatment and obtaining/maintaining sobriety, (3) obtaining and maintaining safe and stable housing, (4) a mental health assessment, and (5) parenting classes. In September and November 2023 and February 2024 DCFS filed family service plans, which noted the case was originally opened when a missing and/or endangered runaway minor was located within the primary residence of the respondent. The respondent was taken into custody for harboring a runaway. Additionally, Lakiyah was home alone with a 10-year-old watching her. The teenaged runaway said that she suspected the child's father of sexually abusing her. DCFS also noted that the minor's father was incarcerated for sexually abusing the teenage runaway. Each plan contained an indication that a caseworker had spoken to respondent and could see that she wanted and was willing to change and could recognize that her actions were wrong. The plans also set forth respondent's service plan requirements and stated that respondent had not made "significant efforts or progress."

_____

[2]The State also filed a second amended petition on December 7, 2023, repeating the same allegations as the first amended petition.

¶ 9     On November 21, 2023, Caritas filed another adjudicatory report, which added anger management services and maintaining a lifestyle free from criminal activity to respondent's service plan. Caritas provided the following updates on her service plan: (1) respondent had completed an integrated assessment and was cooperating with Caritas; (2) respondent had not yet engaged with parenting or anger management services, despite referrals for both; (3) respondent had not gained any additional criminal charges; and (4) respondent was unsuccessfully discharged from mental health and substance abuse treatment on November 9, 2023, for failing to attend two appointments in three months; she was then re-referred to services. Regarding visitation, respondent had not missed any scheduled visits and generally acted appropriately with and showed interest in the child; however, in 1 out of 10 total visits, she failed to observe safety concerns.

¶ 10     An adjudicatory hearing was held on December 4, 2024. The respondent and the minor's father both stipulated that the minor was neglected. The matter proceeded to a dispositional hearing at which time both parents were found to be unfit. The circuit court entered written adjudicatory and dispositional orders on the same date. The minor was made a ward of the court and placed in the care of DCFS, and supervised visitation under DCFS monitoring was ordered. The parents were admonished that they must comply with DCFS's service plan and correct the conditions requiring the child to be placed in care, or risk the termination of their parental rights.

¶ 11     The circuit court set a date of March 1, 2024, for a permanency hearing. On that date, the court entered a docket entry order stating that respondent failed to appear in court, a DCFS caseworker reported that she had not taken a drug test "in some time." The court reset the matter, and also found that neither parent had made reasonable efforts or reasonable progress towards the return of the minor to their care.

¶ 12    DCFS filed additional service plans in June and August 2024 and February 2025 which repeated the list of services respondent was required to complete, as well as updated the court on her progress. Caritas filed eight permanency reports between February 2024 and April 2025 which included the same service plan tasks and delineated respondent's progress. The most recent report stated that in the past nine-month period, she had made "no efforts and no progress." She was inconsistent in communicating with the caseworker and failed to comply with court orders in both this case and connected cases involving her two other children.

¶ 13    Caritas deemed respondent's compliance with all tasks apart from anger management to be unsatisfactory. Respondent's therapist reported that she was satisfactory on anger management; however, Caritas noted that "a completion certificate cannot be provided and observation of learned and incorporated behavior will be hard to observe," as there were no monthly reports of her progress.

¶ 14    While Caritas noted that respondent had completed her parenting class in March 2025 after originally being referred in October 2023, her progress was nevertheless unsatisfactory due to her lengthy delay. Additionally, within the aforementioned nine-month period, respondent "kidnapped her other two children twice in one day and was arrested" in September 2024 in front of Lakiyah.

¶ 15    Respondent was unsuccessfully discharged from mental health services twice for noncompliance. After she completed a mental health assessment in January 2025 the psychologist reported that her psychological functioning seemed stable, but she had a "tendency to minimize her symptoms" and a history of selecting partners who were abusive to her and/or her children. Despite "intact cognitive functioning," she was rated unsatisfactory due to the two prior unsuccessful discharges and the psychologist's opinion that her results "should be interpreted with

5

caution as she may have answered some questions to put herself in a positive light," and minimized her shortcomings and substance abuse.

¶ 16 Regarding domestic violence services, respondent was rated unsatisfactory due to her failure to engage in services from November 2023 to August 2024 and was then discharged due to being incarcerated. Respondent was required to attend domestic violence courses as both an aggressor and a victim; while she restarted services following her release, she had only completed 20 out of 40 aggressor courses and had not yet started victim courses. Additionally, given the note in her psychological evaluation that she had a history of abusive relationships, the report indicated that respondent's relationship with her boyfriend must be observed, as respondent wished to live with him and her child in the future.

¶ 17 The report also explained that respondent had not remained in safe and stable housing over the course of the case. She reported at least five different living situations, including the time she spent in jail. Respondent was therefore rated unsatisfactory on this task. Respondent further failed to maintain a lifestyle free from criminal activity, as she had incurred criminal charges in connection with harboring a runaway, a theft, violating an order of protection, and kidnapping her two other children twice.

¶ 18 Regarding maintaining sobriety, respondent was unsatisfactorily discharged from substance abuse services in November 2023 and May 2024 for failing to consistently attend appointments. She completed another assessment in July 2024 and was ordered to complete 16 drug tests from the nine-month period of review from December 2023 through August 2024. Of those 16 tests, she failed to appear for 12, tested positive for methamphetamines and amphetamines

for 2, tampered with the results for 1, and tested negative for 3.[3] Respondent was then incarcerated in September and October 2024. Following her release, she attended 12 drug tests, all of which were negative. While her therapist reported that she was making progress and beginning to take "some acceptance" for her past drug use, she had previously been reported as minimizing and glossing over her issues.

¶ 19     Lastly, respondent was rated unsatisfactory on her visitation plan. Although she attended monthly supervised visits, at which she was observed to be safe and appropriate with the minor, it was reported that respondent violated the terms of the plan by staying over in the child's foster home. In addition, she admitted to once keeping the child at her own home in Missouri for at least four nights. Furthermore, respondent was prohibited from involving her boyfriend in the visits, and she failed to abide by this requirement.

¶ 20     The circuit court held the rescheduled permanency hearing on August 19, 2024. Respondent stipulated to the same findings as in the permanency order. After hearing testimony and reviewing the evidence, the court ruled as to respondent that she had not made reasonable efforts or reasonable and substantial progress towards the return of the minor. The court admonished respondent to cooperate with DCFS and complete her service plan, or risk termination of her parental rights.

¶ 21     A subsequent permanency order was entered on January 31, 2025. The circuit court again found that respondent had failed to make reasonable efforts or reasonable and substantial progress toward the return of the minor and had not completed her service plan. The court further found

---

[3]For two of the tests at which defendant failed to appear, she provided the court with photos of negative test results. Thus, two of the negative tests are also counted among the tests for which she failed to appear.

that the appropriate permanency goal was substitute care for the minor pending determination of termination of parental rights.

¶ 22 On the same day, the State filed an amended motion for termination of parental rights, alleging that respondent had failed to make reasonable efforts or progress in any nine-month period between December 6, 2023, and January 31, 2025. The minor's father signed a final and irrevocable consent for adoption the following month, and the circuit court set the matter for a contested permanency hearing regarding respondent.

¶ 23                                B. Permanency Hearing

¶ 24 The permanency hearing took place on March 10, 2025. Caritas foster care case manager Ashley Orr testified for the State. She stated that she had been assigned to the minor's case in October 2023. Orr explained that respondent's service plan included cooperation with DCFS, mental health treatment, substance abuse treatment, parenting, safe and stable housing, maintaining a criminal activity free lifestyle, anger management, and domestic violence services. She also stated that Caritas was supposed to have quarterly meetings with respondent, but that these meetings did not occur due to lack of contact or communication from respondent.

¶ 25 Orr testified that respondent was rated unsatisfactory for mental health treatment after being unsuccessfully discharged twice, in 2023 and 2024. After she completed a subsequent mental health assessment in July 2024 she was not recommended for services. She then completed a psychological evaluation, which recommended that she attend therapy to address certain issues from the evaluation. Orr confirmed that respondent was currently rated satisfactory for anger management, but testified that her counselor "could not provide a certificate or documentation" of the anger management materials she had given respondent.

8

¶ 26    According to Orr, respondent was currently satisfactory for substance abuse services. In the six months prior to the hearing, she had been consistent in attending drug testing and tested negative for all illicit substances.[4] However, this was not the case prior to that period. Respondent's last positive test was in March 2024 when she tested positive for methamphetamines. She then failed to appear for testing for a three-month period.

¶ 27    Regarding parenting classes, Orr testified that respondent was referred to services in November 2023 but she did not complete the program. She completed an assessment in July 2024 and was currently attending a program. Orr stated that respondent recently reported to her that she "should have graduated," although Orr had not yet been able to obtain documentation of this. On cross-examination, Orr was asked whether she was aware that respondent had successfully completed her parenting classes at the time of the hearing. She responded that respondent may have done so, but Orr had not obtained any report establishing this.

¶ 28    Orr testified that respondent was referred to domestic violence counseling in November 2023 and completed an assessment in August 2024. Although respondent disclosed that she was a victim of domestic violence, she was recommended 40 sessions of perpetrator counseling following her evaluation. Orr stated that respondent was currently engaged in those services and had completed 11 out of the 40 sessions by the date of the hearing.

¶ 29    Regarding maintaining a lifestyle free from criminal activity, Orr explained that respondent had been arrested on September 7, 2024, for kidnapping her two other children by picking them up twice within a 24-hour period, violating an order of protection. Respondent was rated unsatisfactory on this task. Orr further testified that respondent had reported to her that she

_____

[4]Orr noted that she only tested positive for THC, but that her most recent test came back negative for all substances, including THC.

obtained housing in January 2025; prior to this time, she did not have a consistent living situation. However, as Caritas measured stability over a six-month period, at the time of the March 2025 hearing, respondent was still unsatisfactory on obtaining and maintaining safe and stable housing.

¶ 30    Orr had also supervised respondent's visits with the minor and stated that respondent behaved appropriately. She explained that respondent's visitation remained supervised, because of her overall unsatisfactory rating on her service plan. Orr further stated that she would not currently recommend unsupervised visitation, due to the September 2024 kidnapping incident and the time that respondent took the minor across state borders to her home in Missouri without authorization. Over the approximately 560 days that this case had been pending, Orr testified that there had never been a court order or department recommendation that respondent be afforded unsupervised visitation privileges.

¶ 31    She additionally explained that the department was informed that the minor appeared to have more of a relationship with respondent's boyfriend than was previously disclosed, including time spent around him in person. This was despite the fact that it had not been approved for the minor to have contact with respondent's boyfriend. Orr also added that in respondent's psychological report, respondent admitted to a history of selecting partners who were abusive towards her and her children.

¶ 32    After Orr had discussed each task of respondent's service plan, the court inquired whether she had ever been rated satisfactory on the plan overall, and whether there was a nine-month period in which she had specifically been rated as unsatisfactory. Orr responded no to the first question, and yes to the second, and further clarified that she was referring to the period from December 4, 2023, to September 4, 2024. She testified that the department recommended the goal of substitute

10

care pending termination of parental rights, due to the nine-month period in which respondent had been rated unsatisfactory on the goal of returning the minor to her home.

¶ 33    Respondent testified that she had complied with the agency's requests for information. She explained that she moved to Missouri to find a better job and secure a better life for her children, but that this was difficult due to the pending cases against her and her period of incarceration. She added that she was able to secure a home in January 2025 after going back and forth between living with her mother and in a hotel. Respondent averred that she had obtained a full-time job and enrolled in school since her release from jail and was set to graduate from an online culinary school program in November 2025. She further stated that she was able to pay her bills and secure a vehicle.

¶ 34    Respondent also testified that she had completed parenting classes on March 6, 2025, and presented a certificate of completion. She stated she had been attending the mental health and substance abuse therapy that was recommended to her, and she found it very beneficial in making her a better person and potentially a better parent. She testified that she took her daughter across state borders unsupervised in the summer of 2024 because her mother was sick, and once she got better, respondent went back to complying with her supervised visitation. Respondent explained that she had forgotten to tell her caseworker about the unsupervised visits, and then was scared to tell her, for fear of what could happen. Respondent admitted that she had had to re-engage in services before, but averred that this time was different, because she was no longer deeply depressed, and had found her footing with work, school, and housing.

¶ 35    The guardian *ad litem* testified to recommend a goal change of substitute care pending termination of respondent's parental rights; the State agreed with this recommendation. The guardian *ad litem* explained that this was because it was "clear [that] *** she's not complied with

11

the service plans and orders of this Court" during the approximately 560 days that the case had been pending. He also noted that, in that entire time, respondent still had not been allowed unsupervised visitation.

¶ 36    The circuit court then stated that it had heard all of the above testimony, assessed the credibility of the witnesses, and considered all of the evidence as it related to the nine-month period from December 4, 2023, to September 4, 2024. The court noted that respondent had moved around between four different locations over a short period of time and had given her boyfriend access to the minor when he had not been vetted and approved. To the latter point, the court also noted that respondent had a history of selecting partners who were abusive to her and her children, which interfered with her ability to parent safely. The court added that respondent was arrested for kidnapping her two other children and the minor was with her when she was arrested, and there was an indicated finding against her for violating the visitation plan by keeping her daughter in Missouri against the court's order.

¶ 37    The circuit court also mentioned respondent's history of being rated unsatisfactory on the majority of her service plan throughout the relevant nine-month period. The court then found that the goal of returning the minor to respondent's home was inappropriate and not in the child's best interest. The court then ordered that the goal be changed from return home to substitute care pending the court's determination on the termination of her parenting rights.

¶ 38                                C. Termination Hearing

¶ 39    The circuit court held a termination hearing on May 9, 2025. At the start of the hearing, over the State's objection, respondent's counsel requested a continuance so that respondent could obtain other counsel. He explained that respondent did not believe her attorney had the requisite expertise in this area of law and wanted time to find someone with more experience with such

matters. The circuit court denied the request, stating that a 30-day continuance would not be enough time for a new attorney to get up to speed on and litigate the issues, and that the court was aware of counsel's knowledge and expertise regarding juvenile law. The court then proceeded to the unfitness portion of the hearing.

¶ 40    Orr again testified on respondent's Caritas service plans, explaining that she rated respondent's progress every six months, beginning with the first service plan she created for respondent, in October 2023. The services included were cooperation with Caritas, obtaining and maintaining sobriety, mental health treatment, parenting classes, safe and stable housing, and maintaining a lifestyle free from criminal activity. At her first review in April 2024 respondent was rated unsatisfactory on all tasks, as she was not engaged in services at that time. Orr also mentioned that she was unable to contact respondent for a month and a half due to respondent's unannounced move to Missouri.

¶ 41    Orr next testified that respondent's second service plan was filed in February 2024 and added domestic violence counseling. At the next review period, respondent was rated unsatisfactory on communication with Caritas because she failed to attend monthly meetings with the caseworker, sign releases, or keep the caseworker up to date on contact information. She was unsatisfactory on parenting classes because she did not complete any classes or make an appointment to attend them. She did not complete a substance abuse, mental health, or anger management assessment, and was thus rated unsatisfactory on all three tasks. Orr was unable to observe whether respondent had safe and stable housing, so she was rated unsatisfactory on that task as well. However, Orr did note that respondent remained free from criminal activity during this period.

13

¶ 42    Orr next testified about respondent's June 2024 service plan. No changes were made to respondent's services, and she was rated unsatisfactory once again for failing to complete or attempt to complete any tasks. Orr stated that respondent also made no progress on her next plan, filed in August 2024, although she was slightly more consistent in attending drug testing and attended weekly substance abuse classes in July 2024. However, her attendance was interrupted by her incarceration, and she remained unsatisfactory. Orr also restated the incident that led to respondent failing to maintain a lifestyle free from criminal activity, although she added on cross-examination that respondent was never convicted of kidnapping. However, she was convicted of violating an order of protection.

¶ 43    Once respondent was released from jail at the end of October 2024 she began to re-engage in services, but she had already been discharged from parenting classes at that point. Additionally, she had not begun anger management, had not remained free of criminal activity, had not completed substance abuse treatment, and did not have stable housing. She also introduced her boyfriend to the minor, against agency recommendation.

¶ 44    Orr stated that up until January 31, 2025, respondent did not complete any services and did not make substantial progress in any of the services. Orr opined that, as of that date, respondent was no closer to regaining custody of her daughter than she was at the start of the case in October 2023. Respondent did not testify.

¶ 45    After the fitness portion of the hearing, the circuit court found that respondent was unfit to parent because she failed to make reasonable efforts or progress to correct the conditions that led to the minor's removal during any nine-month period following the adjudication, and specifically from December 6, 2023, through January 31, 2025. The court then commenced the best-interest portion of the hearing.

14

¶ 46    Orr again testified for the State. She explained that the minor, who was five at the time of the hearing, had been in foster care since August 2023. Orr stated that the child "really truly blossomed into an individual" since being moved into a traditional foster home in September 2024. Orr testified that before she moved to her current foster placement, the minor didn't speak much and clung to her grandmother; however, now that she was placed in a traditional home, she was very vocal and did not have attachment issues. Orr had no concerns with the child's placement.

¶ 47    Orr further testified that the child was safe, her developmental needs were being met, and she received adequate food, shelter, and healthcare. Furthermore, she had her own room, many toys, and age-appropriate clothing. The foster family had books in their home and helped teach her reading, and the child was excelling in her pre-kindergarten program. Orr reported that the minor had integrated into her foster family and their extended family, while being able to develop her own identity. The family was black, like the minor, and practiced Christianity, which was respondent's preferred faith.

¶ 48    The foster family was willing and able to adopt, and although they had not yet signed for adoption, Orr stated that they would do so. The family had an adopted 12-year-old son, to whom the child had grown attached; she interacted with him like a sibling and they both showed each other love. She was also very attached to the foster mother's daughter, who visited frequently. The foster parents also showed her love and wanted to provide her with permanency. While the minor had said that she wanted to go home to respondent, she also referred to her foster parents as "mom" and "pops," and told them that she wished to remain in their home. Her therapist also reported that the minor was not sad to have left her grandmother's home, where she had previously been living.

¶ 49    Orr also believed that the minor was functioning better than she had been prior to moving to her current placement. Orr concluded that respondent was not close to regaining custody of the

minor, and she believed it was in the minor's best interest to be made free for adoption so she can be provided permanency through the current foster home.

¶ 50　　Respondent testified that she regretted her past actions, and that she never would have been with a man like the minor's biological father had she known he was a sexual abuser; she also never suspected that he would do something like what he did to the teenager respondent took in. Respondent said that she would never have allowed something like that to happen to the minor, and as far as she knew, the minor had not been sexually abused. She was upset that her daughter had witnessed her arrest and had tried to tell her to look away. Respondent also testified that she hadn't known that she was in violation of the order of protection at the time. She admitted to using methamphetamine at the time of her arrest, and that the court had found that she was a danger to her child because she hid another child from law enforcement and that child was subsequently sexually assaulted in her home.

¶ 51　　Respondent stated that she would be able to provide for the minor now, if given the chance, as her living situation had stabilized and she lived near friends and family who could help her. Respondent was willing to work with Caritas in the future, if the child was returned home to her. Respondent further testified that she moved back to Illinois to get her kids back and be closer to them, and that she loved the child very much. She stated that she had been sober from methamphetamine for a year as of the May 2025 hearing date and had stopped using marijuana in September 2024. She acknowledged that during the course of the case, she was asked to submit to drug testing 16 times; 3 of those tests were positive for illicit substances, 2 were clean, and she failed to appear for 10.[5]

---

[5]It is unclear from the record where the discrepancy in the total number of drug tests lies.

¶ 52 The circuit court then found that it was in the minor's best interest to terminate respondent's parental rights, and the permanency goal be changed from substitute care pending termination of said rights to adoption. An order to that effect was entered on May 9, 2025. In the order, the court found by clear and convincing evidence that respondent was unfit to have the minor pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)) due to having failed to make reasonable efforts and reasonable progress towards the return of the minor to her home within a nine-month period between December 6, 2023, and January 31, 2025. The court further found, by a preponderance of the evidence, that it was in the minor's best interest that respondent's parental rights be terminated. Respondent filed a timely notice of appeal, which was accelerated pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018).

¶ 53                                    II. ANALYSIS

¶ 54 Appointed counsel on appeal argues that the termination of respondent's parental rights was proper, and there are no meritorious arguments to the contrary. In the memorandum supporting her *Anders* motion, counsel states that she considered raising the following issues on appeal: (1) whether the circuit court erred in changing the permanency goal to substitute care pending termination of parental rights, (2) whether the circuit court erred in finding that respondent was unfit to parent pursuant to sections 1(D)(m)(i) and (ii) of the Adoption Act, (3) whether the circuit court erred in finding that it was in the minor's best interest that respondent's parental rights be terminated; and (4) whether respondent was denied effective assistance of counsel during the termination proceedings. Counsel has determined that these issues would be without arguable merit, and the circuit court's judgment was therefore proper.

17

¶ 55                    A. Change of Permanency Goal

¶ 56    Section 2-28 of the Juvenile Court Act requires the circuit court "to establish a permanency goal that is in the best interest of the child." (Internal quotation marks omitted.) *In re T.S.*, 402 Ill. App. 3d 1159, 1169 (2010); 705 ILCS 405/2-28(2.4) (West 2022). The statute further provides that the court's determination shall include the following factors: (1) the age of the child; (2) available placement options; (3) the child's current placement and the intent of the family regarding adoption; (4) the child's emotional, physical, and mental status; (5) types of services offered and whether they were successful/why they failed; (6) the availability of currently-needed services; (7) the status of the child's siblings; and (8) whether a potential permanent caregiver for the child had been identified, if the child was not already in a placement likely to achieve permanency. 705 ILCS 405/2-28(2.4) (West 2022). The court must also consider the permanency goal contained in the service plan, as well as the efforts made toward achieving that goal. *Id.*

¶ 57    The circuit court is afforded broad discretion to select a permanency goal that is in the best interests of the child, and we will not overturn its decision on appeal unless it is against the manifest weight of the evidence. *In re R.A.L.*, 319 Ill. App. 3d 946, 947-48 (2001). A decision is contrary to the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. In child custody cases, "even deeper deference is given to the trial judge than under the familiar manifest weight of the evidence standard because of the delicacy and difficulty of the cases." *In re S.K.B.*, 2015 IL App (1st) 151248, ¶ 28.

¶ 58    Here, the circuit court held a permanency hearing on March 10, 2025, after which it ruled that the permanency goal should be changed from return home to substitute care pending the

18

court's determination on the termination of respondent's parenting rights. We find that this decision was not against the manifest weight of the evidence.

¶ 59    The evidence presented at the hearing, as well as the reports filed with the court, strongly supported the court's finding that this change was in the best interest of the minor. Orr testified that respondent was not in regular communication with Caritas, making it difficult to assist her in completing her services. She was unsuccessfully discharged from mental health services twice and was rated unsatisfactory. Respondent was also unsatisfactory on parenting classes despite her current enrollment in a program; she had previously been referred to parenting services but failed to complete them. She similarly had yet to complete domestic violence counseling. She also failed to demonstrate a period of safe and stable housing.

¶ 60    Respondent was further rated unsatisfactory on maintaining a lifestyle free from criminal activity, based on her arrest and period of incarceration. She had also violated the terms of her visitation plan by keeping the minor with her unsupervised and out of state, against the court's order. She further allowed her boyfriend access to the minor when he had not been vetted and approved to do so, which was particularly concerning given her history of abusive partners.

¶ 61    While she had started being consistent in appearing for and testing negative on her drug tests, she also had a significant history of failing to appear for testing, as well as positive tests in the past. However, she did receive a satisfactory rating on substance abuse services at the time of the hearing. Respondent also received a satisfactory rating on anger management, but Caritas was unable to obtain documentation showing her progress.

¶ 62    Respondent testified that she had recently re-engaged with services. However, the State countered that this was not her first time doing so, as she had been dropped from them in the past. Additionally, more than nine months had passed in which respondent failed to show reasonable

efforts or progress, and the longer she was allowed to keep trying, the longer the minor would go without permanence and stability in her life.

¶ 63    In rendering its decision, the circuit court stated that it had reviewed the statutory best-interest factors, as well as the testimony of Orr and respondent and the recommendation of the guardian *ad litem*, and assessed the credibility of the witnesses. The court spoke in detail about the bases for its finding that the goal of return home was inappropriate for the best interest of the child, as summarized above. The court also noted that it took the "very experienced" guardian *ad litem*'s recommendation that the permanency goal be changed "very, very seriously." In light of the deference given to the circuit court's determination regarding permanency goals, we conclude that there is no meritorious argument to be raised that the determination was against the manifest weight of the evidence.

¶ 64                           B. "Unfit Person" Finding

¶ 65    A parent's right to raise his or her child is a fundamental right, which a court may not terminate without the parent's consent except as authorized by statute. *In re Gwynne P*., 215 Ill. 2d 340, 354 (2005). A court's statutory authority to involuntarily terminate parental rights is governed by the Juvenile Court Act and the Adoption Act. *Id.* Pursuant to the Juvenile Court Act, the involuntary termination of parental rights requires a two-step process. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). First, the court must determine, by clear and convincing evidence, that the parent is an "unfit person" as defined by section 1(D) of the Adoption Act. *Id.*; 705 ILCS 405/2-29(2) (West 2022); 750 ILCS 50/1(D) (West 2022). If the court makes a finding of unfitness, it next considers whether termination of the parent's rights is in the best interests of the child. *In re Donald A.G.*, 221 Ill. 2d at 244; 705 ILCS 405/2-29(2) (West 2022).

20

¶ 66    As applicable to the underlying case, the Adoption Act defines an "unfit person," in relevant part, as:

> D. "Unfit person" means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following ***:
>
> * * *
>
> (m) Failure by a parent (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act, or (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor ***. 750 ILCS 50/1(D)(m)(i), (ii) (West 2022).

¶ 67    Under the Adoption Act, a "reasonable effort" is "a subjective standard and refers to the amount of effort reasonable for the particular parent." *In re P.S.*, 2021 IL App (5th) 210027, ¶ 34. The court must determine "whether the parent has made earnest and conscientious strides toward correcting the conditions that led to the removal of the minor from the home." *Id.*

¶ 68    "Reasonable progress," by contrast, is determined by an objective standard, which is based upon the amount of progress measured from the conditions existing at the time custody was revoked. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 47. Measuring reasonable progress under section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2022)) involves a consideration of "the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 (citing *In re C.N.*, 196 Ill.2d 181, 216-17 (2001)).

¶ 69    In reviewing the lower court's findings that a parent is unfit and that terminating parental rights is in the best interest of the child, we do not retry the case; rather, we must determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793,

21

¶ 31. The circuit court's finding of unfitness is afforded great deference because the court was best positioned to view and evaluate the parties and their testimony. *Id.* Accordingly, on appeal, we will not reweigh the evidence or reassess the credibility of the witnesses. *Id.*

¶ 70    Here, the circuit court found that respondent had made neither reasonable efforts nor reasonable progress. Appointed counsel on appeal states that respondent could argue that she made reasonable efforts because she occasionally kept in contact with Caritas, completed a substance abuse assessment and became more compliant with attending and passing drug tests, was rated satisfactory for anger management, was actively attending parenting and domestic violence classes, had maintained a lifestyle free from criminal activity aside from the September 2024 incident, and obtained housing in January 2025. However, counsel argues that the evidence presented at the unfitness hearing sufficed to support the circuit court's finding that she failed to make reasonable efforts towards the return of her child. We agree and find that the court's decision was not against the manifest weight of the evidence.

¶ 71    Prior to her consistent engagement in services, respondent had a significant history of a lack of compliance and unsatisfactory ratings. The circuit court considered the time from December 6, 2023, to January 31, 2025, in determining that respondent failed to make reasonable efforts or progress during any nine-month period during that time. Orr testified that respondent rated unsatisfactory on all service plan tasks at her first six-month review in April 2024. At that time, she was not engaged in services and did not maintain contact with Caritas; this continued at her second review. Respondent eventually began actively engaging in services around July and August 2024 but her incarceration in September and October 2024 interrupted her participation, and caused her to be rated unsatisfactory on maintaining a lifestyle free from criminal activity.

¶ 72    After she was released, respondent restarted services, but she had already been discharged from parenting classes at that point. She had also yet to start anger management therapy, although she eventually achieved a satisfactory rating on that task. Around this time, respondent also introduced her boyfriend to the minor, which she was not permitted to do due to her history of abusive partners. She also did not have stable housing until the end of the period reviewed by the court. In fact, the majority of respondent's greatest efforts and progress in correcting the conditions that led to the minor's removal took place only in 2025. Orr testified that up until January 31, 2025, respondent had not completed any services to Caritas's satisfaction. Respondent's visitation also remained supervised, and respondent had previously violated her visitation by taking her child out of state without notifying the agency.

¶ 73    If a qualifying nine-month period exists in which respondent failed to make reasonable efforts, respondent cannot argue that she later began to show effort. See 750 ILCS 50/1(D)(m)(i) (West 2022) ("during *any* 9-month period following the adjudication of neglected or abused minor." (Emphasis added.)) Furthermore, we defer to the circuit court's assessment of Orr's and respondent's credibility, as well as its balancing of conflicting testimony. Based on the evidence summarized above, we find that the State clearly and convincingly showed that respondent failed to make reasonable efforts, and the circuit court's finding was not against the manifest weight of the evidence.

¶ 74    A consideration of respondent's progress towards reunification, as measured objectively by her compliance with her service plan, shows that the circuit court's finding that she failed to make reasonable progress was also not against the manifest weight of the evidence. It is clear from the record that respondent failed to substantially comply with most of the tasks required to correct the conditions that led to the minor's removal, from her first service plan in October 2023 through

23

January 2025. For the same reasons as discussed above, we conclude that the State clearly and convincingly demonstrated respondent's lack of progress.

¶ 75    Giving deference to the circuit court's determination, and without reweighing the evidence, we conclude that there is no meritorious argument that could be made that the court's finding was unreasonable or arbitrary.

¶ 76                              C. "Best Interest of the Child" Finding

¶ 77    After determining that respondent was unfit to parent, the circuit court found that terminating her parental rights was in the best interest of the child. Once the court makes a finding of unfitness, "[t]he issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The parent's interest in maintaining the parent-child relationship "must yield to the child's interest in a stable, loving home life." *Id.* At this stage of the termination hearing, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31.

¶ 78    In making a best-interest determination, the court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *Id.* ¶ 32 (quoting *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006)); see 705 ILCS 405/1-3(4.05) (West 2022).

24

¶ 79    As with the circuit court's findings at the unfitness stage, we afford the court great deference, as it is in a superior position to view the witnesses, assess their credibility, and weigh conflicting evidence. *Id.* ¶ 33. We will not reverse the circuit court's best-interest determination unless it is against the manifest weight of the evidence. *Id.*

¶ 80    At the best-interest portion of the termination hearing, Orr testified that the minor had been in her current foster placement since September 2024 and was safe, secure, and thriving in the home. Based on her observations, Orr had no issues with the placement. The family matched the minor's culture and religion, and the minor was integrated into the immediate and extended foster family. The minor was excelling in school, participating in activities, and receiving healthcare. The family was willing to adopt and already had an adopted son who the minor viewed as a brother. Orr also testified that the minor was developing her own identity in the foster home, and her developmental needs were being met.

¶ 81    While the minor had indicated at one point that she wanted to go home to respondent, she also referred to her foster parents as her parents, and told them she wished to remain with them. The child's therapist had also indicated that she was not sad to have left her grandmother's house, where she had previously been placed. Orr also testified that the foster family showed the minor love and could provide her permanency, and she believed that the minor was functioning better than she had been prior to being placed with them.

¶ 82    Respondent testified that she loved the child and regretted her past actions. She stated that she would never let her child be sexually abused and would never have been with someone like the child's biological father if she had known he was an abuser. She also testified that she was working hard to be able to provide for the child and get her life back on track, and she believed

25

that she would be successful now because she was sober from methamphetamine, had addressed her mental health, and had family and friends nearby who could help her.

¶ 83 On appeal, appointed counsel acknowledges that respondent clearly loves her daughter and wants to provide for her. However, these are not the primary concerns at this stage of termination proceedings. *In re D.T.*, 212 Ill. 2d at 364. The record shows that the State demonstrated by a preponderance of the evidence that it was in the child's best interest to terminate respondent's parental rights. The testimony and evidence sufficiently supported findings that the statutory factors weighed in favor of termination based on the child's best interest. We therefore agree with counsel that there is no meritorious argument to be made that the trial court's best-interest determination was against the manifest weight of the evidence.

¶ 84                           D. Effective Assistance of Counsel

¶ 85 Parents have a statutory right to the effective assistance of counsel in termination proceedings. *In re M.D.*, 2022 IL App (4th) 210288, ¶ 92. Claims of ineffective assistance of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Id.* To prevail on an ineffective assistance claim, the parent must demonstrate (1) that counsel's performance fell below an objective standard of competence; and (2) that the deficient performance prejudiced the parent. *Id.* To show prejudice, the parent must prove a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* Additionally, she must "overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy," as "[m]atters of trial strategy are generally immune from claims of ineffective assistance of counsel." *People v. Smith*, 195 Ill. 2d 179, 188 (2000).

¶ 86    At the start of the termination hearing, respondent attempted to request a continuance so that she could obtain new counsel, as she did not believe her attorney had the requisite expertise to represent her. The circuit court denied her request, stating that it was aware of counsel's knowledge and expertise in the area of juvenile law. It is unclear why respondent believed her attorney was insufficiently experienced in juvenile cases, but there is nothing in the record to indicate that counsel's performance was deficient in any way, or that respondent's parental rights would not have been terminated but for counsel's performance. As such, we agree with appointed counsel on appeal that there is no meritorious argument respondent could bring regarding ineffective assistance of counsel.

¶ 87                                    III. CONCLUSION

¶ 88    As this appeal presents no issue of arguable merit, we grant appointed counsel leave to withdraw and affirm the circuit court's judgment.


¶ 89    Motion granted; judgment affirmed.